# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

UNITED STATES OF AMERICA,　　　　　　)　　　Case No. 2:17-cr-00023-KJD-CWH
　　　　　　　　　　　　　　　　　　　　　)
　　　　　Plaintiff,　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　)
　　　v.　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　)
SERGIO PELAYO,　　　　　　　　　　　　)　　　**REPORT & RECOMMENDATION**
　　　　　　　　　　　　　　　　　　　　　)
　　　　　Defendant.　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　)
_____)

Before the Court is pro se Defendant Sergio Pelayo's Motion to Suppress Evidence (ECF No. 15), filed March 20, 2017. The government responded (ECF No. 20), on April 3, 2017. Pelayo replied (ECF No. 25) on April 10, 2017. The Court conducted an evidentiary hearing (ECF No. 27) on April 17, 2017.

## FACTUAL BACKGROUND

On October 23, 2016 at 3:33 a.m., a 911 call was placed by 12 year old J.C, to report domestic violence he had witnessed. (911 Call, Gov't Ex 1.). J.C. provided the address of the incident, and stated that the people involved were his friend's parents, that "they're having a huge argument," and that his friend's father had slapped and kicked his friend's mother. *Id*. J.C. then provided identifying information for the suspect "Sergio Pelayo" and the victim "Rosie Archuleta." *Id*. When asked if he thought the victim needed an ambulance, J.C. responded that he was not sure and repeated that Defendant had kicked and slapped her. *Id*. J.C. also informed the dispatcher there were three children present, ranging in age from six to twelve. Based on this information, the dispatcher told J.C. he would send officers and medical help to the apartment. *Id.* J.C. confirmed that both Pelayo and Archuleta were inside the apartment "right now." *Id.*

At 3:35 a.m., based upon the 911 call two minutes prior, Las Vegas Metropolitan Police Department ("LVMPD") Officers Liske and Griffin received a dispatch order for the address provided by J.C. The officers approached Pelayo's apartment on foot at 4:14 a.m., having parked a

short distance from the apartment to avoid detection. Officer Liske testified that the dispatch was assigned a Code 1, and that an on-going dispute, or one with injuries, is typically assigned a Code 0 to require the quickest response possible. Officer Griffin testified that, in his experience, in spite of the code assignment, sometimes a Code 1 is also an on-going dispute, and sometimes a Code 0 is not.

To get to Pelayo's apartment, officers climbed to the top of a stairwell dedicated solely to access a landing where the front door to the apartment is located. The landing has half walls which could prevent unwanted observation from the ground level. The landing contained a small sofa and table.

At the top of the stairs, officers found that the security door of the front door was closed, but that the front door itself was slightly opened, so the officers could see inside the apartment. Officer Liske knocked on the security door. Pelayo opened the security door to speak to the officers after the officer asked him to do so. Officer Liske asked if everyone inside the residence was okay, and Pelayo responded affirmatively. Officer Liske informed Pelayo that they were there to investigate a report of domestic violence, and Pelayo responded that his wife was not home and that there had not been any problems with his wife. Nevertheless, the officers asked to enter the apartment to see if his wife was there. Pelayo stated again that his wife was not home. Officer Liske informed Pelayo that was better because they could just walk in (to check on the safety of the reported victim), and then walk out. Pelayo provided his consent for the officers to enter the apartment.

After entering the apartment, Officer Liske saw a 9mm magazine on the kitchen counter. The officer asked Pelayo whether there were any weapons in the house. Pelayo responded that there was a pistol in the bathroom and a rifle by his bed, and Officer Liske passed this information to Officer Griffin, who was walking through the apartment. Officer Griffin opened the shower curtain and found and cleared a bullet from the pistol in the bathtub. Officer Liske continued to speak to Pelayo, who stated that he wanted a lawyer because the officers were "going to take him in." The officers stated that they were not going to "take him in." One of the officers then told Pelayo that he had no problem with him owning a gun, and then asked, "you aren't a felon, are you?" Pelayo responded

2

that he was and that he knew he was not supposed to have a firearm. In response to further questions, Pelayo said he knew he could get into trouble for the firearm and that he was probably in trouble at that point. Pelayo then made further incriminating statements. Officer Griffin continued to perform the protective sweep and found the rifle inside a case by the bed in the bedroom. The officers then arrested Pelayo for possession of a firearm by a prohibited person. The grand jury indicted Pelayo on January 24, 2017 with being Felon in Possession of a Firearm, a violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2). (Indictment (ECF No. 1).).

Pelayo moves to suppress all physical evidence and testimonial evidence seized on October 23, 2016, including the Beretta 9mm pistol, Savage Arms .22 caliber rifle, and Pelayo's statements. Pelayo argues that when the officers conducted a "knock and talk" to investigate the 911 call, they encroached on the curtilage of his apartment and violated his Fourth Amendment rights. Additionally, he argues that the protective sweep of the apartment was unreasonable under the circumstances, and therefore constituted an unreasonable search. Finally, he argues that while the officers were within the apartment, Pelayo asked for an attorney, and because questioning continued, the statements which he made were taken in violation of his Fifth Amendment rights. The government responds that the officers' presence on Pelayo's front porch landing was proper under the emergency exception to the warrant requirement of the Fourth Amendment, that the protective sweep was consensual, and that Pelayo was not in custody during his encounter with law enforcement.

## ANALYSIS

### A. The Officers' Entry into the Apartment

"It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, (1980) (footnote omitted). The presumption of unconstitutionality that accompanies "the [warrantless] entry into a home to conduct a search or make an arrest" may be overcome only by showing "consent or exigent circumstances." *Steagald v. United States*, 451 U.S. 204, 211 (1981). Indeed, "it is a cardinal principle that 'searches conducted outside the judicial process, without prior approval by

judge or magistrate, are *per se* unreasonable under the Fourth Amendment–subject to only a few specifically established and well-delineated exceptions.'" *Mincey v. Arizona*, 437 U.S. 385, 390 (1978) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).  The government bears the burden of justifying a warrantless search. *Id.*, at 390-91.

One exception to the warrant requirement is the emergency doctrine.  As the Supreme Court explained in *Mincey v. Arizona*, "[w]e do not question the right of the police to respond to emergency situations. . . . [T]he Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid." 437 U.S. at 392.  Similarly, in *Brigham City v. Stuart*, the Supreme Court held that "one exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury." 547 U.S. 398, 403 (2006).  "Accordingly, law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Id.  See also, United States v. Stafford*, 416 F.3d 1068, 1073 (9th Cir. 2005) (same, also referred to as the "community caretaking" exception).

The Ninth Circuit has adopted a two-part test for determining whether the emergency exception applies, which asks "whether: (1) considering the totality of the circumstances, law enforcement had an objectively reasonable basis for concluding that there was an immediate need to protect others or themselves from serious harm; and (2) the search's  scope and manner were reasonable to meet the need." *U.S.  v. Snipe*, 515 F.3d 947, 951 (9th Cir. 2008).  Domestic violence cases do not "create a per se exigent need for warrantless entry." *United States v. Brooks*, 367 F.3d 1128, 1136 (9th Cir. 2004).  In the context of 911 calls reporting incidents of domestic violence, the Ninth Circuit has upheld warrantless searches under the exigency and emergency exceptions where the police cannot see the victim and have reason to believe that he or she is in the home and potentially in danger.  *United States v. Harris*, 642 Fed. Appx. 713, 715 (9th Cir. 2016).

Once the police have lawfully entered, their "warrantless search must be strictly circumscribed by the exigencies which justif[ied] its initiation.'" *Mincey*, 437 U.S. at 393 (quoting *Terry v. Ohio*, 392 U.S. 1, 25-26 (1968)).  Police may seize any evidence that is in plain view during

the course of their legitimate emergency activities. *Id*.

Pelayo characterizes the police visit to his apartment as an improper "knock and talk." A proper "knock and talk" would allow the officers to encroach upon the curtilage of a home for the purpose of asking questions of the occupant. *United State v. Perea-Rey*, 680 F.3d 1179, 1187 (9th Cir. 2012). Pelayo argues that in approaching the apartment, the officers must demonstrate that they conformed to the habits of the country, . . .by doing no more than any private citizen might do," and that the unusual hour of the visit – 4:15 a.m. – was an unreasonable intrusion upon the curtilage of his home. *United States v. Lundin*, 817 F.3d 1151, 1159 (9th Cir. 2016).

A home's curtilage is entitled to the same Fourth Amendment protections as the home. *Oliver v. United States*, 466 U.S. 170, 180 (1984). The Supreme Court has described the curtilage as "the area to which extends the intimate activity associated with the sanctity of a [person's] home and the privacies of life." *Id*. Courts consider four, non-exhaustive factors to determine whether a particular area is within the curtilage: "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *United States v. Dunn*, 480 U.S. 294, 307 (1987).

The Court agrees that the landing is part of the apartment's curtilage. The landing, which is located at the top of a flight of stairs immediately adjacent to the front door, easily satisfies the proximity factor. The landing is akin to the front porch of a house, an area that has long been recognized as part of a house's curtilage. *Florida v. Jardines*, 133 S.Ct. 1409, 1415 (2013). The landing also satisfies the enclosure factor. The landing is enclosed by a half wall. This stairwell creates a clear pathway from the sidewalk to the front door of Pelayo's apartment. The landing also satisfies the use factor. Pelayo had a small couch and table located on the landing, apparently using it as an extension of the living area in his apartment. Finally, the design of the landing helped to prevent unwanted observation because from ground level, it would be difficult to observe individuals on the landing. The lower half of the body would be obscured by a half wall. The landing is also on the second story of a building with no similarly elevated area adjacent to it. Although the area was

not completely shielded from outside observation, the half wall and elevation gave the landing sufficient protection from observation to satisfy the last factor.

Identifying the landing as curtilage, however, does not end the analysis. Here, an emergency existed which allowed the police to address the emergency. Officers responded to the apartment as the result of a domestic violence 911 call which indicated that Pelayo had kicked and slapped the caller's friend's mother, that they were still in the residence, and there were young children present. As a result of the call, the officers and medical assistance were dispatched to the apartment.[1] Upon arrival, although the apartment was quiet, and Pelayo was not injured or disheveled, the officers had no way of knowing whether Archuleta was safe or injured from the reported incident. The nature of a domestic violence call weighs heavily in the totality of the circumstances to determine whether there was an objectively reasonable belief an emergency existed. *United States v. Martinez*, 406 F.3d 1160, 1164-65 (9th Cir. 2005) ("The volatility of situations involving domestic violence makes them particularly well-suited for an application of the emergency doctrine.) Considering the totality of the circumstances, the Court finds that law enforcement had an objectively reasonable basis for concluding that there was an immediate need to render assistance or to protect others from serious harm. Accordingly, it was reasonable for the officers to approach the front door to the apartment, even though in doing so, they encroached upon the apartment curtilage.

Pelayo consented to the search of the apartment when the officers arrived, and he does not argue that the consent was coerced. It is well settled that "a search conducted pursuant to a valid consent is constitutionally permissible." *United States v. Soriano*, 361 F.3d 494, 501 (9th Cir. 2003), *citing Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). Even if consent had not been given, because the emergency was established, a protective search by Officer Griffin was permitted as long as it was reasonable in scope and manner to meet the need. *Snipe*, 515 F.3d at 951. Here, it was reasonable for Officer Griffin to walk through the apartment to find Archuleta, who might have been injured in the reported domestic dispute. *See Brooks*, 367 F.3d at 1136 (the continued presence of a

---

[1] Medical assistance was dispatched but did not travel to the apartment, awaiting further instructions based upon the officers' investigation.

suspected abuser and victim in a hotel room after a domestic violence call created exigent circumstances allowing for an objectively reasonable search in light the tendency of victims of domestic abuse to be less than forthcoming about the dangers which they may face from an aggressor who remains on the scene).  As a result of the entry justified by exigent circumstances, the subsequent seizure of the handgun from the bathroom was not unconstitutional under the  Fourth Amendment.  *Snipe, 515 F.3d* at 947 (If law enforcement, while responding to an emergency, discovers evidence of illegal activity, that evidence is admissible even if there was not probable cause to believe that such evidence would be found.)   In conclusion, the Court finds that the officers' entrance into the apartment without a search warrant was justified under the emergency exception, and that the seizure of the weapon was justified and reasonable under the circumstances.

**B.  Pelayo's statements**

Once inside the apartment, officers asked Pelayo various questions, including whether there were any firearms in the apartment.  Pelayo said there were two firearms in the apartment, and stated where they were.  Pelayo then said that "I'm going to want a lawyer if you are going to take me in." The officers responded immediately that they were not going to "take him in."  After discovering the pistol, one of the officers said that he had no problem with Pelayo having firearms, and then asked if he was a felon.  Pelayo responded that he was and that he knew he was not supposed to have a firearm.  In response to further questions, Pelayo said he knew he could get into trouble for the firearms.

Pelayo argues that officers never advised him of his *Miranda*[2] rights, and that Pelayo asked for a lawyer during his discussions, and was not provided a lawyer, and therefore his statements should be suppressed.  The government responds that Pelayo was not in custody until he was actually arrested, and that any questioning was for officer and public safety.

The obligation to administer *Miranda* warnings attaches once a person is subject to "custodial interrogation." *Miranda v. Arizona*, 384 U.S. 436, 445 (1966).  "Custody" turns on whether there is a formal arrest or restraint on freedom of movement of the degree associated with a

---

[2]  *Miranda v Arizona*, 384 U.S. 436, 445 (1966)

7

formal arrest. *U.S. v. Rodriguez-Preciado*, 399 F.3d 1118, 1127 (9th Cir. 2005) (citing *United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002)). An officer's obligation to give a suspect *Miranda* warnings before interrogation extends only to those instances where the individual is "in custody." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). The inquiry on whether an individual is in custody focuses on the objective circumstances of the interrogation, not the subjective views of the officers or the individual being questioned. *Stansbury v. California*, 511 U.S. 318, 323 (1994). The court must determine whether "the officers established a setting from which a reasonable person would believe that he or she was not free to leave." *United States v. Beraun-Panez*, 812 F.2d 578, 580 (9th Cir. 1987), *modified by* 830 F.2d 127 (9th Cir. 1987); *see also United States v. Hayden*, 260 F.3d 1062, 1066 (9th Cir. 2001). "Subjective criteria, such as the subject's age, education, intelligence, or previous experience with law enforcement, are not relevant to whether a reasonable person would feel free to leave, and therefore to whether a particular suspect is in custody." *See Yarborough v. Alvarado*, 541 U.S. 652, 668 (2004).

The following factors are among those likely to be relevant to deciding whether a suspect is in custody: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." *Hayden*, 260 F.3d at 1066 (citing *Beraun-Panez*, 812 F.2d at 580). Other factors may also be pertinent to the ultimate determination whether a reasonable person would have believed he could freely walk away from the interrogators. The factors set forth in *Beraun-Panez* and *Hayden* are simply representative of those that frequently recur. *See Kim*, 292 F.3d at 973-974.

*Miranda* is subject to a narrow "public safety" exception, allowing police officers the right to "ask questions reasonably prompted by a concern for the public safety." *New York v. Quarles*, 467 U.S. 649, 656 (1984). In order for the public safety exception to apply, there must have been "an objectively reasonable need to protect the police or the public from any immediate danger associated with [a] weapon." *Id*. at 658, 659 n.8.

The Supreme Court has also held that the right to counsel recognized in *Miranda* is so

important to suspects in criminal investigations that it "requir[es] the special protection of the knowing and intelligent waiver standard." *Edwards v. Arizona*, 451 U.S. at 483. If the suspect effectively waives his right to counsel after receiving the Miranda warnings, law enforcement officers are free to question him. *North Carolina v. Butler*, 441 U.S. 369, 372-376 (1979). When a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation. *Edwards*, 451 U.S. at 484-485. This additional layer of protection is "designed to prevent police from badgering a defendant into waiving his previously asserted Miranda rights." *Michigan v. Harvey*, 494 U.S. 344, 350 (1990).[3]

Given the concerns about Archeleta's safety, and the discovery of the pistol magazine in plain view when the officers entered the apartment, their questions about whether there were weapons in the house, and whether the dispute with Pelayo's wife had been only verbal, were appropriate. The Court has already found that the emergency exception for a warrant applied, and the same emergency circumstances justify the officers to ask unwarned questions about firearms in the apartment to ensure the safety of the inhabitants of the apartment, as well as the officers. *New York v. Quarles*, 467 U.S. at 656. Regardless of whether he was in custody or not, under *Quarles*, Pelayo's admission that there were firearms in the house will therefore not be suppressed.

As to Pelayo's additional responses to the officers' questions, the central issue is whether Pelayo was in custody during the time the officers were in the apartment. Pelayo consented to the officers' entry into the apartment, but only after insisting that his wife was not there. The officers

---

[3] Whether counsel has actually been requested is an objective inquiry. *See Connecticut v. Barrett*, 479 U.S. 523, 529 (U.S. 1987). If a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, police are not required to cease questioning. *Davis v. United States*, 512 U.S. 452, 458 (U.S. 1994) (holding that the remark "maybe I should talk to a lawyer" was not a request for counsel). Rather, the suspect must unambiguously request counsel. As the Court has observed, "a statement either is such an assertion of the right to counsel or it is not." *Smith v. Illinois*, 469 U.S. at 97-98 (brackets and internal quotation marks omitted). The suspect must articulate his desire to have counsel present with clarity sufficient for a reasonable police officer in the circumstances to understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, the officers are not required to stop questioning the suspect. *See Moran v. Burbine*, 475 U.S. 412, 433, n. 4 (1986).

9

were not confrontational, asking only general questions about the alleged domestic dispute.  Their

visit did not take more than about 10 minutes.  However, Pelayo had no choice except to obey the

officers' order to sit on the sofa in his living room while the apartment was "swept."  The only thing

that may have caused Pelayo to reasonably believe that was free to go (to walk out of his own

apartment) is that he was told that he was not going to be "taken in" as the officers conducted the

sweep of the apartment.[4]   But that comment was made before Pelayo admitted that he was a felon

and not allowed to possess guns.  Later, Pelayo was told by Officer Griffin, "let me tell you straight,

you are not supposed to have guns, right?"  Pelayo said "no."[5]  At that point, the officers had

established a setting, including requiring Pelayo to remain on his sofa, and confronting him with his

status as a felon in possession of a firearm, from which a reasonable person would believe that he or

she was not free to leave. *Beraun-Panez*, 812 F.2d at 580.  Accordingly, Pelayo should have been

advised of his *Miranda* rights at that time, and his statements made after that time are suppressed.

Pelayo argues that his statements should be suppressed because, although he did not receive

Miranda warnings, he asked for a lawyer.  Because the Court has found that Pelayo was not in

custody at the time he mentioned needing a lawyer, he cannot invoke his right to counsel under

Miranda.

//

//

//

//

//

//

//

---

[4]   Officer Griffin did testify on cross examination that he believed that Pelayo was not free to leave while the investigation was on-going, but that was not communicated to Pelayo.

[5]   Officer Griffin then asks, "but you have guns?"  Pelayo says, "yes sir."  Pelayo then explains where he got the guns, and makes other incriminating statements.

## CONCLUSION AND RECOMMENDATION

Accordingly, **IT IS HEREBY RECOMMENDED** that Pelayo's Motion to Suppress Evidence (ECF No. 15) be **granted** in part and **denied** in part.

## NOTICE

This Report and Recommendation is submitted to the United States District Judge assigned to this case under 28 U.S.C. § 636(b)(1). A party who objects to this Report and Recommendation may file a written objection supported by points and authorities within fourteen days of being served with this Report and Recommendation. Local Rule IB 3-2(a). Failure to file a timely objection may waive the right to appeal the District Court's Order. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).

DATED: June 13, 2017.

_____
C.W. Hoffman, Jr.
United States Magistrate Judge